1
2
3
4
5
6
7
8
9               **IN THE UNITED STATES DISTRICT COURT**

10              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

11

12   SHARON MEYERS,                          CASE NO. CV F 06-0190 LJO

13                  Plaintiff,               **DECISION ON SOCIAL SECURITY**
                                             **COMPLAINT**
14          vs.                              (Docs. 14-16.)

15   JO ANNE B. BARNHART,
     Commissioner of Social
16   Security,

17                  Defendant.
                                          /
18

19                              **INTRODUCTION**

20          Plaintiff Sharon Myers ("plaintiff") seeks this Court's review of an administrative law judge's

21   ("ALJ's") decision that plaintiff is neither disabled nor entitled to disability insurance benefits under

22   Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Pursuant to 28 U.S.C. § 636(c) and F.R.Civ.P.

23   73, the parties agreed to proceed before a United States Magistrate Judge, and by a June 12, 2006 order,

24   this action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all proceedings.

25   Based on review of the Administrative Record ("AR") and the papers of plaintiff and defendant Jo Anne

26   B. Barnhart, Commissioner of Social Security ("Commissioner"), this Court DENIES plaintiff's requests

27   to reverse the Commissioner's decision, to award plaintiff disability insurance benefits or to remand for

28   further proceedings.

                                             1

# BACKGROUND

## Plaintiff's Personal Background

Plaintiff is age 57 and has a high school education along with college level units. (AR 23, 108, 135, 350, 737.)  Plaintiff worked for more than 29 years at California State University Fresno ("Fresno State") as an administrative assistant and budget operations analyst until October 2000 when she claims she experienced abrupt onset of right wrist and neck pain with swelling in her right hand and fingers. (AR 24, 130, 182, 264, 717, 739.)

## Administrative Proceedings

On August 16, 2001, plaintiff protectively filed her disability insurance benefits application to claim disability since November 9, 2000 due to myofascial pain, bulging cervical disc, mild carpal tunnel syndrome, pain in right wrist, arms and shoulders, and headache.  (AR 23,108, 112, 129.)  With its February 7, 2002 Notice of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claim and determined that plaintiff's condition does not prevent her to work.  (AR 83, 84.) On February 19, 2002, plaintiff filed her Request for Reconsideration to claim chronic pain and worsened condition.  (AR 87.)  With its August 15, 2002 Notice of Reconsideration, SSA again denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent her to work. (AR 88.)

On September 3, 2002, counsel was appointed for plaintiff.  (AR 56.)  On September 4, 2002, plaintiff filed her Request for Hearing by Administrative Law Judge to claim inability to perform substantial gainful activity due to myofascial pain, bulging disc, carpal tunnel syndrome, pain in right wrist, arms, shoulders and legs, severe headaches, depression, increased lower back pain, lack of concentration and chronic pain.  (AR 92.)  After a February 20, 2003 hearing, the ALJ issued his March 19, 2003 decision to find that plaintiff is able to perform work existing in significant numbers in the national economy and is not disabled.  (AR 80, 81.)  Plaintiff submitted to SSA's Appeals Counsel her March 27, 2003 Request for Review of Hearing Decision/Order to challenge the ALJ's March 19, 2003 decision.  (AR 93, 94.)  With its May 20, 2004 order, the Appeals Council vacated the ALJ's March 19, 2003 decision and remanded the case to the ALJ to "[o]btain evidence from a vocational expert to determine whether [plaintiff] has acquired any skills that are transferable to other occupations" and to

[a]ddress the lay witness statement and provide germane evidence from the evidence for the weight assigned to the lay witness' statement." (AR 101.)

After a December 7, 2004 supplemental hearing, the ALJ issued his January 21, 2005 decision to find that plaintiff is not disabled, that plaintiff's past relevant work does not require performance of work-related activities precluded by her residual functional capacity, and that plaintiff is able to perform a significant number of skilled, light and sedentary jobs in California. (AR 39.) Plaintiff submitted to the Appeals Council her February 2, 2005 Request for Review of Hearing Decision/Order to challenge the ALJ's January 21, 2005 decision. (AR 16.) On January 24, 2006, the Appeals Council denied plaintiff's request for review to render the ALJ's January 21, 2005 decision subject to this Court's review. (AR 8.)

**Medical History And Records Review**

*Northwest Medical Group*

Shortly after plaintiff claimed an on-the-job right wrist and hand injury, plaintiff treated with Northwest Medical Group. On October 9, 2000, plaintiff complained of right wrist and hand pain and edema during the prior week and was assessed with right wrist tendinitis. (AR 460, 461.)

*Glenn Fujihara, M.D., Treating Physician*

After reporting wrist and forearm injury to her employer, plaintiff treated with Glenn Fujihara, M.D. ("Dr. Fujihara"). In October 2000, Dr. Fujihara observed mild to moderate forearm swelling and mild to moderate cervical and upper back muscle spasms. (AR 446, 447, 449.) Dr. Fujihara assessed cumulative trauma overuse syndrome of plaintiff's right forearm and wrist, tenosynovitis, right lateral epicondylitis, and cervical, thoracic and right shoulder strain. (AR 449.) Dr. Fujihara recommended a forearm splint and 20 minutes of hourly icing. (AR 449.) Dr. Fujihara did not anticipate permanent disability and anticipated complete recovery within six weeks. (AR 450.) Dr. Fujihara restricted plaintiff to light duty of four hours per day and prescribed physical therapy. (AR 446, 447.) In November 2000, plaintiff reported she was "okay" with light duty but her neck and upper back worsened. (AR 455.) Dr. Fujihara observed moderate forearm swelling and mild to moderate cervical and upper back muscle spasms. (AR 442-445.) In the absence of forearm improvement, Dr. Fujihara recommended referral to a physiatrist, temporary disability and total rest other than physical therapy.

(AR 444, 445.)  Dr. Fujihara noted "good steady improvement" with plaintiff's work absence.  (AR 442.)

_____*P.T. Healthworks – Physical Therapy*

During October 2000 to January 2001, plaintiff engaged in physical therapy at P.T. Healthworks to address her right wrist and related pain which she attributed to her work. (191-230.)  Treatment notes reflect plaintiff's feeling better, improvement, decreased pain and wrist and elbow range of motion within normal limits.  (AR 191, 195, 197, 198, 201, 203, 211, 212, 214, 216, 219-221, 224.)

### *Alan Jakubowski, M.D., Treating Physician*

Plaintiff treated with Alan Jakubowski, M.D. ("Dr. Jakubowski"), board certified in physical medicine and rehabilitation, to address her upper extremities and arm.  On November 29, 2000, plaintiff complained of constant aching, burning pain and tightness in her upper back about her right shoulder and across her right forearm and elbow.  (AR 437.)  Dr. Jakubowski's physical examination revealed grossly intact strength in the right upper extremity and slightly limited right shoulder range of motion. (AR 438.)  Dr. Jakubowski assessed right upper extremity strain secondary to overuse syndrome with involvement of the wrist, forearm, elbow shoulder and upper back region.  (AR 438.)  Dr. Jakubowski placed plaintiff on no activity status, referred plaintiff to physical therapy to work on passive modalities and gentle stretching and exercising to the upper back and right shoulder and forearm, provided plaintiff an interferential muscle stimulator unit for home use, and gave plaintiff a Medrol dose pack to calm down inflammation.  (AR 438.)  On December 13, 2000, plaintiff complained that she was symptomatic in the right forearm and wrist and cervicothoracic region.  (AR 436.)  Dr. Jakubowski assessed right wrist and elbow pain secondary to tenosynovitis, lateral epicondylitis secondary to overuse work activities, and right cervicothoracic myofascial pain.  (AR 436.)  Dr. Jakubowski continued plaintiff on physical therapy, maintained plaintiff on no activity status, and recommended another Medrol dose pack course.  (AR 436.)

On January 3, 2001, Dr. Jakubowski noted plaintiff's continued significant discomfort of the right upper back musculature which had not responded to physical therapy.  (AR 435.)  Dr. Jakubowski assessed cervical and thoracic myofascial pain secondary to overuse activities, right wrist and elbow pain secondary to tenosynovitis, and lateral epicondylitis from overuse activities and which is resolving.  (AR

435.)  Dr. Jakubowski referred plaintiff to a myofascial massage specialist, maintained plaintiff on no activity status, continued Ultram and Daypro as needed and provided a third Medrol dose pack.  (AR 435.)  On January 24, 2001, Dr. Jakubowski found plaintiff "significantly symptomatic in the upper back musculature and assessed significant cervicothoracic myofascial pain in plaintiff's upper back and right wrist and elbow pain secondary to tenosynovitis and lateral epicondylitis from overuse activity.  (AR 433.)   Dr. Jakubowski continued plaintiff's myofascial massage, use of an interferential muscle stimulator, and no activity status.  (AR 433.)  Dr. Jakubowski recommended trigger point injections to reduce  upper  back  musculature  tightness.  (AR  433.)   On  January  31,  2001,  Dr.  Jakubowski's examination revealed palpable tender points at the bilateral trapezius muscles and slightly limited range of motion.  (AR 432.)  Dr. Jakubowski provided plaintiff four trigger point injections and assessed significant cervicothoracic myofascial pain in upper back and right wrist and elbow pain secondary to tenosynovitis and lateral epicondylitis.  (AR 432.)  Dr. Jakubowski continued myofascial massage treatments and no activity status and recommended followup trigger point injections.  (AR 432.)

On February 8, 2001, plaintiff reported three days of significant reduction and muscle spasm from the trigger point injections and received six additional trigger point injections.  (AR 431.)  Dr. Jakubowski continued his treatment plan and assessment of significant cervicothoracic myofascial pain in upper back and right wrist and elbow pain secondary to tenosynovitis and lateral epicondylitis.  (AR 431.)  On February 21, 2001 after her second trigger point injections, plaintiff reported significantly increased pain and tightness in her neck and upper back.  (AR 430.)  Dr. Jakubowski's examination revealed significantly increased tenderness on light palpation over the bilateral trapezius muscles and more limited range of motion over the cervical spine.  (AR 430.)  Dr. Jakubowski assessed cervicothoracic pain with recent worsening and exacerbation of unclear etiology.  (AR 430.)  Dr. Jakubowski recommended an cervical spine magnetic resonance imaging ("MRI") to rule out internal derangement and electrodiagnostic evaluation of bilateral upper extremities to rule out neuropathic process. (AR 430.) On March 7, 2001, plaintiff reported slight improvement in her upper back and arms but remained "quite symptomatic." (AR 429.) Dr. Jakubowski's examination revealed diffuse tightness and tenderness to the cervicothoracic region to direct palpation.  (AR 429.)  Dr. Jakubowski continued to assess cervicothoracic pain of unclear etiology and plaintiff's no activity status and myofascial

massage therapy. (AR 429.) A March 14, 2001 electrodiagnostic evaluation revealed evidence of mild median nerve neuropathy in plaintiff's right wrist and no evidence of cervical radiculopathy. (AR 424.)

On April 11, 2001, plaintiff continued to complain of neck and upper back pain and tightness and bilateral forearm pain. (AR 423.) Dr. Jakubowski assessed mild C3-4 and C6-7 disc protrusion with continued neck pain and bilateral arm pain. (AR 423.) Dr. Jakubowski recommended evaluation of possible cortisone injection to cervical spine disc protrusions and maintained plaintiff's no activity status. (AR 423.) On May 9, 2001, plaintiff continued to complain of neck and upper back pain. (AR 422.) Dr. Jakubowski's examination revealed palpable tightness and tenderness in the paracervical and upper back musculature, full bilateral shoulder range of motion, and limited cervical spine range of motion. (AR 422.) Dr. Jakubowski continued to assess C3-4 disc protrusion with continued neck and upper back pain. (AR 422.) Dr. Jakubowski referred plaintiff for cervical spine epidural injections and continued plaintiff on no activity status and myofascial massage therapy. (AR 422.) On May 30, 2001, plaintiff reported less severe neck pain after a cortisone injection but complained of tightness in her cervicothoracic region. (AR 421.) Dr. Jakubowski's examination revealed limited cervical spine range of motion. (AR 421.) Dr. Jakubowski continued to assess cervical spine protrusion at C3-4 and C6-7 with continued neck and upper back pain. (AR 421.) Dr. Jakubowski continued plaintiff's no activity status and myofascial therapeutic massage therapy. (AR 421.) On June 13, 2001, plaintiff continued to complain of neck and upper back pain. (AR 420.) Dr. Jakubowski's examination revealed paracervical and trapezius muscle tightness and limited cervical spine range of motion. (AR 420.) Dr. Jakubowski assessed cervical disc protrusion at C3-4 and C6-7 and maintained plaintiff's no activity status and myofascial therapeutic massage. (AR 420.) On July 12, 2001, plaintiff complained of continued neck and upper back pain and stiffness. (AR 418.) Dr. Jakubowski's examination revealed cervicothoracic tightness and tenderness and limited cervical spine range of motion. (AR 418.) Dr. Jakubowski assessed multilevel cervical disc protrusions secondary to work related injury and continued cervicothoracic myofascial pain. (AR 418.) Dr. Jakubowski referred plaintiff for a surgical consultation, prescribed pool therapy, and continued plaintiff's no activity status, myofascial massage therapy and muscle stimulator unit use. (AR 418.) On August 16, 2001, plaintiff complained of significant neck and upper back pain and noted that massage therapy temporarily helps. (AR 416.) Dr. Jakubowski's

1  examination revealed cervical thoracic tightness and tenderness and limited cervical spine range of

2  motion. (AR 416.) Dr. Jakubowski continued to assess multilevel cervical disc protrusion secondary

3  to work-related injury and continued cervicothoracic muscle pain. (AR 416.) Dr. Jakubowski found

4  plaintiff "at a permanent and stationary basis as no more improvement is anticipated with continued

5  medical treatment." (AR 416.) Dr. Jakubowski further found a no less than 70 percent loss of work

6  capacity secondary to work-related injury. (AR 416.) Dr. Jakubowski recommended "ongoing

7  medication to be used on an as needed basis, weekly massage therapy and pool therapy. (AR 416.)

8  ### Jason Bowen, D.C., Treating Chiropractor

9  During 2001, plaintiff treated with chiropractor Jason Bowen, D.C. ("Mr. Bowen"). On January

10  25, 2001, Mr. Bowen noted that plaintiff "is extremely emotional today and exhibits symptom

11  magnification with light palpatory touch over the right trapezius and mid thoracic paravertebral fascia."

12  (AR 415.) During spring 2001, Mr. Bowen noted decrease in plaintiff's neck and shoulder pain and

13  discomfort. (AR 412-414.) On July 24, 2001, Mr. Bowen noted that plaintiff "is emotional today

14  regarding her pain" and "is unable to tolerate the full half-hour session of massage therapy." (AR 405.)

15  Thereafter, plaintiff continued to complain of neck and upper back pain. (AR 396-404.)

16  ### William von Kaenel, M.D., Treating Anesthesiologist

17  On May 17, 2001 and June 19, 2001, plaintiff underwent interlaminar epidural steroid injections

18  cervical performed by anesthesiologist William von Kaenel, M.D. ("Dr. von Kaenel"). (AR 231, 239.)

19  On June 4, 2001, Dr. von Kaenel noted plaintiff's 5/5 upper extremities strength and diagnosed cervical

20  disc displacement, cervical radiculitis and cervical spine pain. (AR 257.) Dr. von Kaenel further noted

21  plaintiff's "modest left-sided improvement with epidural steroid injection." (AR 257.) On June 27,

22  2001, Dr. von Kaenel noted that plaintiff had two days of pain relief from the June 19, 2001 epidural

23  steroid injection. (AR 250.) Dr. von Kaenel's physical examination revealed that plaintiff appeared in

24  "mild distress" and plaintiff's 5/5 upper extremity strength. (AR 250.) Dr. von Kaenel diagnosed

25  cervical disc displacement, cervical radiculitis and cervical spine pain and concluded that plaintiff had

26  not benefitted from the epidural steroid injection. (AR 250.)

27  ### Timothy C. Watson, M.D., Consultative Orthopedic Surgeon

28  In connection with plaintiff's workers' compensation claim, orthopedic surgeon Timothy C.

1   Watson, M.D. ("Dr. Watson"), conducted a consultative evaluation of plaintiff and prepared an August

2   1, 2001 report. (AR 264.) Plaintiff's chief complaint was pain in her shoulders. (AR 264.) Dr.

3   Watson's impression was cervical spine degenerative disease, most significant at C3-4 and C6-7, "doubt

4   cervical radiculopathy." (AR 264.) Dr. Watson questioned mild carpal tunnel syndrome, local arthritic

5   problem, chronic trapezial strain, and shoulder derangement problems. (AR 264.) Dr. Watson did not

6   recommend "anything urgent surgically." (AR 264.) Dr. Watson noted that plaintiff "continues to do

7   most activities of daily living except for the heavier ones." (AR 264.) Dr. Watson's neck and upper

8   extremity examination revealed normal overall body motion. (AR 266.) Dr. Watson noted that March

9   9, 2001 MRI "shows some degenerative disc disease with some bulging at C3-4 and C6-7" and

10  "adequate space for the cord with no obvious nerve compression." (AR 267.)

11              ***Satnam S. Atwal, M.D., Treating Psychiatrist***

12       Plaintiff treated with psychiatrist Satnam S. Atwal, M.D. ("Dr. Atwal"), chiefly for medication

13  management. On August 31, 2001, plaintiff complained that she felt depressed and of frequent crying,

14  feeling uptight, incapable and worthless, nervousness, constant worrying, night sleep limited to three

15  hours, fatigue, exhaustion, and poor memory and concentration. (AR 277.) Dr. Atwal diagnosed major

16  depression without psychotic features – moderate to severe in intensity and assessed a 70 Global

17  Assessment of Functioning ("GAF"). (AR 278.) Dr. Atwal started plaintiff on Zoloft 50 mg, Serax 15

18  mg and supportive psychotherapy. (AR 279.) On September 4, 2001, Dr. Atwal noted that plaintiff was

19  sleeping better, felt less edgy and remained depressed with low energy and motivation. (AR 276.) Dr.

20  Atwal concluded that plaintiff "remains clinically depressed" and increased Zoloft to 100 mg and

21  continued Serax 15 mg and supportive psychotherapy. (AR 276.) On September 18, 2001, plaintiff

22  noted that she had recently retired and felt empty, hopeless, incapable, worthless and severely depressed

23  with low energy and social isolation. (AR 275.) Dr. Atwal noted plaintiff's blunted affect and dysphoric

24  mood and increased Zoloft to 150 mg and prescribed Restoril for insomnia. (AR 275.) On October 9,

25  2001, Dr. Atwal noted plaintiff's continued feelings of emptiness and hopelessness, low energy and poor

26  motivation. (AR 274.) Dr. Atwal noted plaintiff's improvement with insomnia, blunted affect and

27  dysphoric mood and added Wellbutrin 150 mg. (AR 274.) On October 11, 2001, plaintiff reported

28  increased physical activity and decreased feeling of depression. (AR 273.) Dr. Atwal decreased Zoloft

and increased Wellbrutrin to 150 mg. (AR 273.) As of October 31, 2001, Dr. Atwal found plaintiff's depression "has improved" and that plaintiff without difficulty is able to: (1) understand simple to complex job instructions; (2) understand and remember job instructions; (3) maintain concentration on a sustained basis; and (4) interact and relate with supervisors and coworkers. (AR 272.) Dr. Atwal found plaintiff's recent and remote memory intact. (AR 272.)

In November 2001, Dr. Atwal noted plaintiff's "significant improvement," increased physical activity and reports of "sleeping well." (AR 394.) Dr. Atwal encouraged plaintiff to increase social and physical activity. (AR 393, 394.) On December 17, 2001, Dr. Atwal noted that plaintiff had "decompensated" after he stopped plaintiff's Zoloft. (AR 392.)

On January 3, 2002, plaintiff showed improvement with increased Zoloft and Wellbutrin. (AR 395.) Dr. Atwal noted plaintiff's "mild to moderate depression." (AR 395.) As of February 28, 2002, Dr. Atwal assessed that plaintiff's depression appeared in "remission" and that plaintiff "feels good whenever her pain settles down." (AR 390.) Plaintiff reported good energy, and Dr. Atwal continued plaintiff on Zoloft 100 mg and Wellbutrin 100 mg. (AR 390.) On April 25, 2002 after her medications had been changed, plaintiff reported feeling depressed, hopeless and helpless and difficulty to concentrate. (AR 388.) Dr. Atwal desired to wait "to see whether we need to treat the depression more aggressively." (AR 388.) On June 6, 2002, plaintiff reported "feeling reasonably good." (AR 386.) On August 8, 2002, plaintiff reported "feeling overwhelmingly depressed and insomniac." (AR 385.) In fall 2002 after Dr. Atwal restarted plaintiff's Zoloft, plaintiff demonstrated improvement, slept well and "is more active around the house doing physical exercises." (AR 381-384.) On October 31, 2002, plaintiff reported enjoying a seven-day cruise. (AR 381.)

Dr. Atwal consistently noted plaintiff's good insight and judgment, intact cognitive functions, and absence of medication side effects. (AR 273-276, 278, 381-395.)

### *Alvin Green, Social Worker*

Plaintiff treated with licensed social worker Alvin Green, LCSW ("Mr. Green") for about a year. According to Mr. Green's September 17, 2001 report, plaintiff experienced major depression, a reaction to pain, and which without plaintiff's physical symptoms "would be considered disabling." (AR 269.) Mr. Green noted plaintiff's impaired concentration and memory, withdrawal, isolation, chronic fatigue

1   and tearfulness, and inability to sustain concentration for two hours for simple, routine tasks.  (AR 269.)

2   In a September 17, 2001 supplemental report, Mr. Green noted a diagnosis of major depression – single

3   episode and that "depression is secondary to the chronic pain and subsequent loss of her

4   career/employment." (AR 494.) Mr. Green started chronic pain management. (AR 494.) On November

5   6, 2001, Mr. Green noted that plaintiff's "depression has decreased/diminished."  (AR 493.)

6       On February 25, 2002, Mr. Green found plaintiff "basically stable" with her depression "under

7   good control" with medication.  (AR 490.)  On May 13, 2002, Mr. Green noted that plaintiff "continues

8   to make progress by accepting her condition."  (AR 489.)  On June 18, 2002, Mr. Green noted that

9   plaintiff "continues to cope with her chronic pain with increased focus on functioning and responding

10  to recommendations to pursue activity/socialization vs. prior isolation." (AR 488.)  On July 22, 2002,

11  Mr. Green noted plaintiff's continued improvement in attitude and morale and that plaintiff "is quite

12  pleased with the physical therapy [and] is finding pain relief . . . she is no longer mourning the loss of

13  her job." (AR 487.)

14                          ***Rustom F. Damania, M.D., Consultative Internist***

15       Internist Rustom F. Damania, M.D. ("Dr. R. Damania"), conducted a December 12, 2001

16  consultative examination of plaintiff.  (AR 289.)  Plaintiff's chief complaints included pain to her neck,

17  shoulder, back, elbow, and right wrist, depression and anxiety.  (AR 289.)  Plaintiff noted she is "very

18  hypersensitive to pain." (AR 290.)  Dr. R. Damania noted near impossibility "to examine her shoulder

19  joints on a passive basis because she would not allow even slight touch." (AR 291.)  Plaintiff's elbow

20  and wrist joints were sensitive to touch. (AR 291.)  Plaintiff warned Dr. R. Damania that "she preferred

21  me not to touch her neck," and plaintiff's thoracic and lumbar spine were tender on slight touch.  (AR

22  292.)  Dr. R. Damania found power was grade 5/5 in plaintiff's upper and lower extremities and noted

23  that none of plaintiff's joints "had any evidence of ankylosis, deformities, subluxations or acute or

24  chronic inflammation.  No matter where the patient was touch[ed] on the back and upper extremities the

25  patient complained of severe pain." (AR 282.)  Dr. R. Damania diagnosed cervical spondylosis with

26  some bulging of discs (but no evidence of radiculopathy on MRI), carpal tunnel syndrome, mild in right

27  wrist, and possible depression.  (AR 293.)  Dr. R. Damania noted the absence of "ankylosis, deformities,

28  subluxations or signs of acute or chronic inflammation, spasticity, rigidity, spasms, atrophy or gross

10

1  weakness." (AR 293.)  Dr. R. Damania found plaintiff "fully ambulatory" and able to: (1) sit, stand and

2  work four or five hours out of a normal eight-hour day; and (2) lift 30-40 pounds occasionally and less

3  than 30 pounds frequently.  (AR 293.)  Dr. R. Damania noted the absence of manipulative, visual or

4  communicative impairments.  (AR 293.)  Dr. R. Damania noted plaintiff's generally normal condition,

5  except tenderness.  (AR 295.)

6  _____*Shireen R. Damania, M.D., Consultative Psychiatrist*

7     Board certified psychiatrist Shireen R. Damania, M.D. ("Dr. S. Damania"), conducted a

8  December 12, 2001 psychiatric evaluation of plaintiff.  (AR 283.)  Plaintiff's chief complaints included

9  considerable pain, stress from inability to work, and significant depression.  (AR 284.)  Dr. S. Damania's

10 mental status examination revealed plaintiff's normoproductive speech, depressed mood, appropriate

11 affect, impulse control and frustration tolerance within normal limits, grossly intact memory, some

12 difficulty with attention, average intelligence, and fair insight and judgment.  (AR 286.)  Dr. S. Damania

13 diagnosed depressive disorder, not otherwise specified, and pain disorder, associated with psychological

14 factors and general medical condition, chronic.  (AR 286.)  Dr. S. Damania concluded that although

15 plaintiff exhibited some concentration difficulty, she "is able to understand, carry out, and remember

16 simple, as well as one and two step job instructions.  (AR 287.)  Dr. S. Damania projected that plaintiff

17 may have difficulty to respond appropriately to coworkers and supervisors due to subjective pain

18 allegations and may have difficulty to respond appropriately to usual work situations and to deal with

19 changes in a routine work setting.  (AR 287.)

20              *Rolf G. Scherman, M.D., Consultative Neurologist*

21     In connection with plaintiff's workers' compensation claim, neurologist Rolf G. Scherman, M.D.

22 ("Dr. Scherman") conducted a consultative examination and completed a January 29, 2002 report.  (AR

23 296.)  Plaintiff noted to Dr. Scherman that "she does not believe she can return to any gainful

24 employment or go through vocational rehabilitation." (AR 296.)  Plaintiff claimed no pain unless she

25 uses her right wrist.  (AR 300.)  Plaintiff further claimed that after writing or working on a computer for

26 30 minutes, she experienced pain up to her shoulder, neck stiffness and tightness, and symptoms going

27 into the left arm.  (AR 300.)  Plaintiff further noted that "her symptoms come and go." (AR 301.)  Dr.

28 Scherman's neurological examination revealed that plaintiff's neck movements were restricted about

11

30 percent in all directions and that plaintiff had "full and free range of motion of the shoulders, elbows, wrists, hands and fingers." (AR 301.) Dr. Scherman noted "no weakness of the upper extremities." (AR 302.) Dr. Scherman opined that plaintiff's medical treatment had been "normal" and that MRI films revealed bulging discs but no surgical lesion and such was "normal for this age group." (AR 303.) As to carpal tunnel syndrome, Dr. Scherman concluded that plaintiff may never have had it or that it resolved and "does not currently have carpal tunnel syndrome." (AR 303.) Dr. Scherman concluded:

> We are left with a patient who has an overuse syndrome on the right arm and, to a mild degree, in the left arm. There are very few objective findings. There is no evidence of any major tendinitis, carpal tunnel or other significant objective pathology. That being the case, we are dealing largely with a myofascial pain syndrome and emotional factors may be playing some role in expression of her disability. (AR 303.)

Dr. Scherman assessed "all that can be done has been done" and plaintiff is precluded from "no heavy use of the arm and no use above shoulder height with the bilateral upper extremities. This also would include the neck." (AR 303.) Dr. Scherman recommended "conservative care in the form of medication" with "no indication for any surgical intervention." (AR 303.) Dr. Scherman summarized: "Quite frankly, I believe her expression of disability and her perception of it is certainly greater than it is." (AR 304.)

In April 12, 2002 and September 16, 2002 reports, Dr. Scherman clarified that plaintiff "had an overuse syndrome of the right arm and to a mild degree in the left arm. There were very few objective findings." (AR 379.) Dr. Scherman found that plaintiff has "no use of the upper extremities above shoulder height" and "there may be an emotional component to her complaints." (AR 373, 379.)

### Frank L. Cantrell, M.D., Treating Neurologist

Plaintiff treated with neurologist Frank L. Cantrell, M.D. ("Dr. Cantrell"), whose January 29, 2002 testing revealed normal nerve conduction velocities of plaintiff's upper limbs. (AR 334.) On April 8, 2002, plaintiff complained of right upper limb pain, right hand and right volar forearm intermittent swelling, bilateral neck pain and continuous headache. (AR 329, 330.) Dr. Cantrell's examination revealed point tenderness over the bicipital tendons bilaterally, restricted right upper limb range of motion, markedly tender right medial epicondyle, indurated and tender right flexor forearm musculature, mild left extensor and flexor forearm musculature tenderness, slight right lateral epicondylar tenderness, and dusky, swollen right forearm. (AR 331.) Dr. Cantrell diagnosed neck strain with resultant

musculoskeletal headaches, bilateral bicipital tendinitis with mildly frozen right shoulder, right medial epicondylitis with flexor forearm myofascial pain (golfer's elbow), mild right lateral epicondylitis with extensor forearm myofascial pain (tennis elbow), hypertension, possible medication dependency and depression. (AR 331-332.) Dr. Cantrell noted diagnostic studies were not indicated and recommended a "more vigorous exercise and stretching program." (AR 332.) Dr. Cantrell was "up front" with plaintiff "regarding the possibility of substance dependency," started plaintiff on Elavil 25 mg nightly and Darvocet-N and discontinued Vicodin and Ultram. (AR 332.)

On May 20, 2002, plaintiff complained of severe right shoulder pain that interfered with her walking when grocery shopping. (AR 327.) Dr. Cantrell's examination revealed point tenderness over the right coracoid process and bicipital tendon and mildly tender forearm musculature, no longer indurated. (AR 327.) Dr. Cantrell recommended progressive/resistive exercises and physical therapy. (AR 327.) On June 25, 2002, Dr. Cantrell noted that plaintiff performed one-pound curls and stretching. (AR 656.) Dr. Cantrell's examination revealed marked point tenderness over the bilateral coracoid processes and bicipital tendons. (AR 656.) Dr. Cantrell assessed that plaintiff "is not progressing." (AR 656.) On August 14, 2002, Dr. Cantrell noted that plaintiff had not been doing an exercise or stretching program and observed marked tenderness over the right suboccipital musculature. (AR 654.) Dr. Cantrell recommended plaintiff to "return to the therapy and again resume her vigorous exercise and stretching program." (AR 654.)

On September 18, 2002, plaintiff complained of neck, shoulder and dorsal arm pain. (AR 325.) Dr. Cantrell's examination revealed the absence of paraspinal musculature nodularity and extremities swelling. (AR 325.) The examination further revealed tenderness over plaintiff's right posterior shoulder and right upper limb and mild tenderness of plaintiff's supple right flexor and extensor forearm musculature. (AR 325.) Dr. Cantrell noted that plaintiff performed five-pound curls and that "[t]his needs to improve." (AR 325.) Dr. Cantrell recommended that plaintiff transition to a gym program. (AR 325.) On November 4, 2002, plaintiff complained of thoracic, neck and shoulder pain. (AR 363, 652.) Dr. Cantrell prescribed physical therapy for appropriate instruction in a progressive/resistive exercise program for plaintiff's upper limbs. (AR 364, 652.) On December 18, 2002, plaintiff complained of neck and shoulder pain. (AR 650.) Dr. Cantrell noted plaintiff performed five-pound

13

1    curls and prescribed six more sessions with a trainer.  (AR 650.)

2                        ***Andrew D. Whyman, M.D., Consultative Psychiatrist***

3            Psychiatrist Andrew D. Whyman, M.D. ("Dr. Whyman"), conducted a June 13, 2002 consultative

4    (agreed medical) examination in connection with plaintiff's workers' compensation claim.  (AR 343.)

5    Plaintiff complained that three or four months prior to the examination, she had been "deeply depressed,

6    realizing she had no job to go back to any longer."  (AR 349.)  Plaintiff noted that she reads for an hour

7    or two daily, is in a book club and reads two or three books per month. (AR 349.)  Plaintiff further noted

8    she "felt good" during a fall 2001 cruise and had a relaxing weekend in Monterey a few months prior

9    to the examination.  (AR 350.)  Plaintiff noted she will perform temporary work a few days a week if

10   she does not obtain Social Security benefits and hopes to perform volunteer work at a children's hospital.

11   (AR 350.)  Dr. Whyman's mental status examination revealed somewhat limited insight and self-

12   understanding and the absence of thought disorder and cognitive disruption.  (AR 352, 353.)  Dr.

13   Whyman's psychological testing revealed psychological distress, depression, anxiety and

14   hypersensitivity. (AR 356.) Dr. Whyman diagnosed major depression, largely in remission, depression

15   not otherwise specified, pain disorder with psychological features and a medical condition, and

16   dependent and histrionic personality features. (AR 356.) Dr. Whyman observed that plaintiff developed

17   major depressive disorder "which gradually evolved into her present less significant, but nonetheless still

18   existing depressive condition." (AR 360.) Dr. Whyman found that plaintiff "is not going to benefit from

19   further psychotherapy" and "should be weaned off her antidepressant medications over the course of the

20   next six months."  (AR 361.)  Dr. Whyman concluded:

> She could not return to the job she was previously doing.  She is not precluded from
> work in a wide variety of other settings.  Given her previous work history, she is not
> likely to need or utilize vocational rehabilitation to any extent and if she resumes
> employment, it would likely be no more than on a part-time basis.  (AR 361.)

24   On November 11, 2002, Dr. Whyman reiterated that "extensive long-term psychotropic medication

25   maintenance for this patient is not going to be helpful."  (AR 337.)

26                        ***Tara Zampardi, Ph.D., Testing Psychologist***

27           Psychologist Tara Zampardi, Ph.D. ("Dr. Zampardi"), conducted June 30, 2002

28   psychodiagnositic testing in conjunction with Dr. Whyman's comprehensive psychiatric examination.

                                                    14

(AR 370.) Dr. Zampardi's testing of plaintiff revealed likelihood of significant psychological distress, conflicts and problems, absence of disabling anxiety, adequate vocabulary skills, moderate range of depression, and medium level of somatization. (AR 370, 371.) Dr. Zampardi summarized that plaintiff "experiences psychological distress characterized by intense feelings of dysphoria, unhappiness, guilt, depression, and tension. She is likely to be self-critical and brooding, which may exacerbate her distress." (AR 371.) Dr. Zampardi noted that plaintiff is likely to present with feelings of chronic fatigue and sluggishness. (AR 372.)

### Thomas J. O'Laughlin, M.D., Treating Physiatrist

Plaintiff was referred to physiatrist Thomas J. O'Laughlin, M.D. ("Dr. O'Laughlin"), to assist with plaintiff's chronic pain. (AR 682.) On June 3, 2003, Dr. O'Laughlin assessed cervicoscapular myofascial pain syndrome, probably underlying cervical degenerative disc disease, interscapular myofascial pain, thoracolumbar myofascial pain, carpal tunnel syndrome, right greater than left wrist, and early fibromyalgia syndrome. (AR 685.) Dr. O'Laughlin recommended physical therapy three times a week for aggressive treatment of cervicoscapular myofascial pain and provided trigger point injections. (AR 685.) A July 9, 2003 EMG and nerve conduction study revealed electrodiagnostic evidence of mild right carpal tunnel syndrome, no other nerve entrapment of upper extremities, and no evidence of right cervical radiculopathy. (AR 671.) Dr. O'Laughlin recommended right wrist splinting and conservative treatment. (AR 671.) On August 8, 2003, Dr. O'Laughlin noted improved range of motion, moderate pain and good relief from pain medication. (AR 667.) Dr. O'Laughlin's physical examination revealed tenderness to neck and shoulder palpation and good strength bilaterally in upper extremities. (AR 667.) Dr. O'Laughlin assessed chronic, severe pain disorder with underlying cervical degenerative arthritis and probable early stage fibromyalgia. (AR 667.)

On September 25, 2003, plaintiff reported that she "is not able to do much more than do the laundry" and "has pain throughout her body." (AR 665.) Dr. O'Laughlin's physical examination revealed tenderness to palpation over fibromyalgia tender points and mildly restricted cervical and shoulder range of motion. (AR 665.) Dr. O'Laughlin assessed fibromyalgia and myofascial pain "which has really progressed" and prescribed physical therapy. (AR 665, 666.) On October 22, 2003, Dr. O'Laughlin treated plaintiff's cervical spine pain and observed muscular tension and tightness. (AR

664.)  Dr. O'Laughlin assessed severe left cervicoscapular myofascial syndrome and recommended to check for worsening disc protrusion.  (AR 664.)  On December 4, 2003, Dr. O'Laughlin noted that plaintiff's right carpal tunnel syndrome symptoms were "slight" but that "her neck and shoulder pain has advanced."  (AR 662.)  Dr. O'Laughlin assessed cervical disc herniation with probable worsening but no significant neural changes.  (AR 662.)  Dr. O'Laughlin recommended an updated MRI and plaintiff's use of a cervical traction machine.  (AR 662.)

On January 12, 2004, Dr. O'Laughlin noted recent worsening of plaintiff's condition and her concern about pain extending to the left upper extremity.  (AR 660.)  Dr. O'Laughlin observed persistent muscular tightness and assessed probable worsening cervical disc degeneration and mild disc protrusion, right wrist carpal tunnel syndrome, and bordering diagnosis of fibromyalgia, lacking substantial lower body pain to meet full syndrome.  (AR 661.)  Dr. O'Laughlin returned plaintiff to physical therapy and recommended repeat EMG and nerve conduction studies.  (AR 661.)  On February 10, 2004, Dr. O'Laughlin observed that plaintiff struggled with her pain and had marked tenderness to palpation over all fibromyalgia tender points.  (AR 691.)  Plaintiff received "very good relief" of her headache and neck pain after suboccipital injections.  (AR 691.)  Dr. O'Laughlin assessed full-blown fibromyalgia, chronic myofascial pain and cervicoscapular myofascial pain.  (AR 691.)  On March 10, 2004, Dr. O'Laughlin noted that plaintiff "is still doing better" and assessed fibromyalgia, superimposed myofascial pain syndrome and cervical degenerative disc disease with improvement from injections and physical therapy.  (AR 690.)  Dr. O'Laughlin continued plaintiff's physical therapy.  (AR 690.)  On May 3, 2004, Dr. O'Laughlin noted that plaintiff had "let go of her psychotropic medications" in that "she feels like she is doing well enough with her depression and has accepted her condition."  (AR 689.)  Dr. O'Laughlin assessed chronic fibromyalgia and myofascial pain with persistent, significant muscular tightness and that plaintiff is improving and that her depression is subsiding.  (AR 689.)

Dr. O'Laughlin's July 7, 2004 examination revealed focal tender trigger points in the mid trapezius, tight mid cervical extensors and slightly restricted range of motion.  (AR 688.)  Dr. O'Laughlin recommended a long-acting opioid.  (AR 688.)  On August 30, 2004, plaintiff presented "hurting allover" with high pain levels.  (AR 686.)  Dr. O'Laughlin noted "an unbelievable amount of muscular hardening in the cervical extensors and trapezius muscles."  (AR 686.)  Dr. O'Laughlin

1  provided trigger point injections to plaintiff's neck and trapezius and assessed chronic fibromyalgia and

2  myofascial pain with underlying cervical disc degenerations and disc bulges/protrusions. (AR 686.) Dr.

3  O'Laughlin recommended that plaintiff start Norco. (AR 686.)

4  Dr. O'Laughlin completed a November 3, 2004 questionnaire to indicate that plaintiff is

5  precluded from full-time work at any exertional level based on her capacity for repetitive usage of upper

6  extremities. (AR 693.) Dr. O'Laughlin estimated that during an eight-hour day, plaintiff is able to sit

7  30 minutes and to stand/walk 20 minutes. (AR 693.) Dr. O'Laughlin noted that during an eight-hour

8  day, plaintiff needs to lie down or elevate her legs three times for one hour or for half an hour twice

9  daily. (AR 693.) Dr. O'Laughlin based his assessment on severe muscle tension, reflex withdrawal, and

10  palpation of muscles and soft tissues of neck, shoulders, back, arms, hips and legs. (AR 693.) Dr.

11  O'Laughlin noted additional limitations of increased pain from stress, decreased tolerance for bright

12  light, noisy environment and high degree of stimulation. (AR 693.) Dr. O'Laughlin noted that plaintiff

13  has limitations due to hand impairments from myofascial pain syndrome and is able to lift up to three

14  pounds frequently. (AR 694.) During an eight-hour day, Dr. O'Laughlin estimated that plaintiff is able

15  reach and handle 30 minutes, lift 10-15 pounds up to five minutes two or three times, and grasp two to

16  three minutes at a time for 20 minutes. (AR 694.) Dr. O'Laughlin estimated that plaintiff is able to

17  reach, handle, push/pull and grasp continuously for three to five minutes. (AR 694.)

18  ***Community Sport Center***

19  Plaintiff underwent physical therapy at Community Sport Center. In a June 18, 2003 initial

20  intake form, plaintiff noted her complaints of chronic pain in her upper extremities, neck, shoulders, and

21  right arm and neck along with periodic muscle spasms running from her neck's nape to her right

22  shoulder. (AR 730.) Plaintiff's treatment plan included heat/ice, ultrasound, soft tissue mobilization

23  and manual traction. (AR 722.) July 18, 2003 notes reflect plaintiff was "having a good day." (AR

24  724.) July 31, 2003 notes reflect that plaintiff's pain symptoms decreased with physical therapy and

25  pool exercises. (AR 721.) Plaintiff was discharged from physical therapy on July 31, 2003. (AR 721.)

26  In September 2003, plaintiff resumed physical and pool therapy and reported that she

27  experienced constant neck, shoulder and right hand pain and increased muscle spasms and that her pain

28  increased from use of her right hand, sitting more than 10 minutes, lifting more than five pounds and

1    household chores.  (AR 716, 719.)  Plaintiff's pain symptoms improved with physical and pool therapy.

2    (AR 709, 710, 712.)  In October and November 2003, plaintiff reported feeling "great" and "much

3    better."  (AR 708, 709.)  According to a December 17, 2003 discharge summary, plaintiff attended 11

4    of 16 physical therapy appointments and canceled or was a no show to several appointments.  (AR 706.)

5    Plaintiff reported "feeling much better" and that she had decreased pain pills from six to one a day.  (AR

6    706.)  Plaintiff was discharged from physical therapy with partial achievement of her treatment goals.

7    (AR 706.)

8         In February 2004, plaintiff resumed physical therapy and claimed constant pain from lifting and

9    prolonged sitting and hand use.  (AR 705.)  According a March 2, 2004 progress note, plaintiff reported

10   feeling better after attending eight physical therapy sessions and reduced symptoms.  (AR 696.)

11                              ***Non-Examining Physicians***

12        Ernest Wong, M.D. ("Dr. Wong"), a California Disability Determination Services ("DDS")

13   physician, completed a January 18, 2002 Physical Residual Functional Capacity Assessment to conclude

14   that plaintiff is able to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) stand/walk

15   about six hours in an eight-hour workday; and (3) sit about six hours in an eight-hour workday but must

16   periodically alternate sitting and standing to relieve pain and discomfort.  (AR 309.)  Dr. Wong noted

17   the absence of postural limitations but limited overhead work and forceful and repetitive grasping and

18   twisting.  (AR 311.)  Dr. Wong assessed a light residual functional capacity with a sit/stand alternative

19   as needed to relieve discomfort.  (AR 314.)

20        DDS psychiatrist Archimedes Garcia, M.D. ("Dr. Garcia"), completed a January 24, 2002

21   Psychiatric Review Technique to note plaintiff's absence of severe impairments.  (AR 305.)  On July

22   1, 2002, Brian Ginsburg, M.D., affirmed Dr. Garcia's assessment.  (AR 305.)

23   _____***Medical Imaging***

24        March 19, 1997 x-rays revealed minor degenerative change in plaintiff's cervical spine.  (AR

25   546.)  February 2, 1998 left elbow and shoulder x-rays revealed calcific peritendinitis and were

26   otherwise unremarkable.  (AR 479.)  October 16, 2000 x-rays of plaintiff's cervical spine and right wrist

27   were negative and revealed "no evidence of fracture or dislocation."  (AR 188, 189.)  A March 9, 2001

28   MRI of plaintiff's cervical spine revealed a C2-3 mild posterior bulge, a C3-4 posterocentral small disc

protrusion without evidence of cord compression, a C4-5 tiny posterocentral bulge vs. protrusion without significant mass effect, a C5-6 disc degeneration with slight posterior disc bulge without significant stenosis, and a C6-7 degenerative disc bulge in an annular fashion along with mild uncovertebral spurring bilaterally. (AR 241-242, 426-427.) A January 13, 2004 cervical spine MRI revealed a mild annular bulge at C6-7 with moderate to severe right neural foraminal narrowing and mild central canal narrowing, focal annular fissure posteriorly at C3-4 disc, and somewhat straightening of cervical spine likely due to muscle spasm. (AR 659.)

### *Medications*

Plaintiff's medications have included Zanaflex 4 mg, Daypro 600 mg, Serax 15 mg, Zoloft 50 mg and 100 mg, Ultram 50 mg, Vicodin 5/500, Wellbutrin 150 mg and 300 mg, Seroquel 25 mg, Darvocet-N, Amitriptyline 25 mg, Motrin 800 mg, Elavil 25 mg, Zestril 10 mg and 20 mg, Provera 5 mg, Premarin 1.25 mg, Norco, Flexeril 10 mg, Baclofen 20 mg, Restoril 15 mg, Ultram 50 mg, Motrin 800 mg, Valium 5 mg, and Oxycodone HCL 5 mg. (AR 134, 166, 179, 181, 183, 185-187.)

### *Vocational Rehabilitation*

In connection with her workers' compensation claim, plaintiff underwent vocational rehabilitation. Certified Rehabilitation Counselor Alexis Zerga ("Ms. Zerga") completed an August 30, 2001 initial evaluation to note plaintiff's transferable office skills, including "able to work with the public; use eyes, hands, and fingers to operate or work on equipment; perform repetitive work tasks; supervise and guide the work of others; write clear and concise reports; work within precise limits or standards of accuracy; follow simple one and 2 step directions; and perform work activities that can be measured and checked." (AR 144.)

### **Plaintiff's Activities And Testimony**

### *Reports And Questionnaires*

Plaintiff completed an August 30, 2001 Disability Report Adult to note that she stopped working on November 9, 2000 because her job duties "exasperated pain and swelling of wrist (right), arms and shoulders." (AR 129.)

Plaintiff's friend of 30 years completed a September 18, 2001 Daily Activities Questionnaire (Third Party Information) to note that plaintiff spends a typical day in pain, trying to get comfortable,

1  reading, attending doctors' appointments and napping. (AR 156, 161.) Plaintiff sleeps three to four

2  hours a night and experiences sleeping difficulties due to "constant pain." (AR 157.) Plaintiff

3  experiences difficulty to wash her hair. (AR 157.) Plaintiff prepares meals with her husband's

4  assistance. (AR 157.) Plaintiff grocery shops, and her husband or son takes in and puts away the

5  groceries. (AR 157.) Plaintiff is able to manage bills, maintain banking accounts, dust, load the

6  dishwasher, and prepare laundry. (AR 158.) Plaintiff needs no assistance to go out, has a driver's

7  license and drives. (AR 158.) Plaintiff enjoys reading, remembers what she reads and watches

8  television two or three hours a day and movies. (AR 159, 160.) Plaintiff has no difficulty getting along

9  with others, visits with friends and relatives, and cares for two dogs. (AR 159.) Plaintiff experiences

10  no concentration problems except when she has severe pain. (AR 160.) Plaintiff has no problem to

11  follow instructions. (AR 160.) Plaintiff "is not able to carry on with normal life activities," "is very

12  limited," and "is always in chronic pain." (AR 161.)

13      Plaintiff completed a September 19, 2001 Daily Activities Questionnaire to note that she spends

14  an average day engaging in medical therapy (massage and water aerobics), reading, taking medication

15  for pain and muscle spasms, practicing pain management techniques, including ice/heat upper

16  extremities, and napping. (AR 162.) Plaintiff is limited to four hours nightly sleep due to pain, and

17  takes Serax 15 mg nightly to assist with sleep. (AR 162.) Plaintiff experiences difficulty to wash her

18  hair and to perform household chores, including vacuuming and mopping. (AR 162.) Plaintiff and her

19  husband prepare meals. (AR 163.) Plaintiff grocery shops, and her husband or son takes in and puts

20  away groceries. (AR 163.) Plaintiff performs dusting, loading the dishwasher, and laundry. (AR 163.)

21  Plaintiff enjoys reading, remember what she reads, and watches television three hours daily and rents

22  movies. (AR 164, 165.) Plaintiff drives a car to visit family and to have dinner. (AR 164.) Plaintiff

23  has no difficulty to get along with others and talks to relatives on the phone three or four times a week.

24  (AR 165.) Chronic pain interferes with plaintiff's concentration. (AR 166.) Plaintiff requires several

25  days to dust and takes breaks during meal preparation. (AR 166.) In response to how her condition

26  prevents her to work, plaintiff responded:

27      Job duties exasperated pain and swelling of the upper extremities and right hand and
      wrist. Pain affects my technical and analytical thinking/ability. Sitting for more than 20

28      minutes becomes difficult with pain in my shoulders and the back of my head. (AR 166.)

1   After she became ill, plaintiff worked four hours a day and experienced chronic pain, right hand and

2   wrist and upper extremity swelling, severe headaches, and constant pain with repetitive tasks.  (AR 166.)

3        Plaintiff completed a February 19, 2002 Reconsideration Disability Report to claim increased

4   lower back pain, depression, "entire body" pain, lack of concentration due to pain, and inability to return

5   to work and to wash her hair.  (AR 172.)

6   *Plaintiff's February 20, 2003 ALJ Hearing Testimony*

7        Plaintiff testified at the February 20, 2003 ALJ hearing that she lives with her husband and then

8   23-year-old son.  (AR 738.)  Plaintiff has a driver's license and drives three times a week to shop and

9   three times weekly to a gym.  (AR 738-739.)

10       Plaintiff last worked November 9, 2000 at Fresno State as an administration operations analyst.

11  (AR 739.)  Plaintiff was an assistant to the dean of the school of science and math.  (AR 739.)  Plaintiff's

12  job included desk work and 85 percent of her responsibilities were data entry.  (AR 739.)

13       In October 2000, plaintiff experienced an attack of pain in her upper extremities, and the pain

14  prevented her to return to her duties after her doctor excused her from work for a week.  (AR 740.)

15  Plaintiff filed a workers' compensation claim.  (AR 740.)

16       Plaintiff experiences chronic neck, shoulder and right arm pain, right hand swelling, tingling and

17  numbness, and headaches from her neck to the base of her head.  (AR 740, 741.)  Plaintiff estimates her

18  headaches are an eight on a one to ten severity scale.  (AR 741.)  Dr. Cantrell referred plaintiff to

19  physical therapy three times a week.  (AR 741.)  Plaintiff understands that her neck, shoulder and back

20  problems result from repetitive motion syndrome and upper extremities overuse.  (AR 750.)

21       Plaintiff had been treating with Dr. Atwal 15 months prior to the ALJ hearing.  (AR 743.)

22  Plaintiff saw Dr. Atwal every two to four weeks.  (AR 743.)  Plaintiff receives medication from Dr.

23  Atwal but not counseling.  (AR 743.)  Plaintiff had received counseling from Mr. Green for anxiety and

24  depression.  (AR 743, 744.)  Mr. Green's treatment helped plaintiff "tremendously."  (AR 744.)

25       Initially, plaintiff denied side effects from medication but later noted concentration and memory

26  difficulties.  (AR 744.)  Plaintiff attributed dizziness to her pain.  (AR 744.)

27       After sitting for five to ten minutes, plaintiff needs to stand up or lie down due to shoulder pain.

28  (AR 744, 745.)  Plaintiff is able to stand five to ten minutes and to lift up to five pounds.  (AR 745.)

1   Plaintiff estimated that she is able to walk three blocks.  (AR 745.)  Plaintiff has problems pushing and

2   pulling and using her hands in an outstretched position.  (AR 745.)  Such activities cause right forearm

3   swelling.  (AR 745.)  Plaintiff has difficulty turning and moving her neck.  (AR 747.)

4        Plaintiff spends a typical day "mostly taking meds," watching television and managing her pain.

5   (AR 746.)  Plaintiff attends a gym three days a week for 30 minutes of stretching.  (AR 746.)  Plaintiff

6   performs neither household chores nor outside work and cooks a family meal twice a week.  (AR 746-

7   747.)  Plaintiff cares for her small dogs and occasionally attends church.  (AR 747.)

8        Plaintiff claims that she is unable to work, to perform housework and to care for herself.  (AR

9   749.)  Plaintiff is on disability retirement from her state employment.  (AR 749.)  At the time of the

10  hearing, plaintiff's workers' compensation claim was in settlement stages.  (AR 749.)

11  ***Plaintiff's December 7, 2004 ALJ Hearing Testimony***

12        Plaintiff testified at the December 7, 2004 ALJ hearing that she has earned six college units and

13  that most of her job training was on the job.  (AR 756.)  Plaintiff attended workshops.  (AR 756.)

14  Plaintiff settled her workers' compensation claim with no effect on her Fresno State retirement.  (AR

15  762.)

16        Plaintiff's carpal tunnel syndrome symptoms include hand swelling and pain and knots in her

17  arms.  (AR 764.)  Plaintiff takes pain medication for her right hand carpal tunnel syndrome.  (AR 764.)

18        Plaintiff stopped her gym program after her workers' compensation benefits ceased to pay for

19  it.  (AR 764.)  The program included stretching and walking on a treadmill but plaintiff cannot afford

20  to pay for the program.  (AR 764, 765.)  Plaintiff devotes 30 minutes each morning to stretches which

21  she learned in the program.  (AR 765.)

22        Plaintiff understands Dr. O'Laughlin diagnosed muscular pain.  (AR 766.)  Dr. O'Laughlin has

23  told plaintiff that she has fibromyalgia.  (AR 766.)  Plaintiff takes medication to control her

24  hypertension.  (AR 767.)

25  ***Vocational Expert Cheryl Chandler's December 7, 2004 ALJ Hearing Testimony***

26        Vocational expert Cheryl Chandler ("Ms. Chandler") testified at the December 7, 2004

27  supplemental ALJ hearing that plaintiff's administrative work at Fresno State was highly-skilled clerical

28  and that a hypothetical person of plaintiff's age, education, experience and residual functional capacity

1   would be able to perform plaintiff's past relevant work.  (AR 755.)  Ms. Chandler noted that plaintiff's

2   "clerical skills are many" to which she is able to transfer to a broad range of clerical positions.  (AR

3   758.) Ms. Chandler observed that there are 447,000 light, sedentary clerical jobs in California, including

4   medical and legal transcription performed in offices and at home.  (AR 759.)  Ms. Chandler estimated

5   that a sit/stand option would erode 50 percent of the secretarial jobs.  (AR 760.)  According to Ms.

6   Chandler, a repetitive grasping preclusion would eliminate secretarial type jobs.  (AR 760.)  Ms.

7   Chandler opined that a person with slight limitation in ability to deal with usual work situations and

8   dealing with routine changes "would still be able to work in some of the clerical positions but maybe

9   not all, certainly not the higher stress, high demand." (AR 761.) Ms. Chandler further opined that there

10  are no jobs for a person limited to 30 minutes (five minutes at a time) during an eight-hour day of

11  reaching, handling and feeling.  (AR 762.)

**The ALJ's Findings**

13          With his January 21, 2005 decision, the ALJ identified the specific issue as whether plaintiff is

14  under a disability, defined as inability to engage in substantial gainful activity due to a medically

15  determinable physical or mental impairment that can be expected to result in death or that has lasted or

16  can be expected to last for no less than 12 continuous months.  (AR 22-23.)  In concluding that plaintiff

17  could return to her past relevant work and is not disabled at any time through the date of the decision,

18  the ALJ found:

19          1.      Plaintiff's degenerative disc disease of the cervical spine and hypertension are severe but

20                  do not meet or medically equal an impairment in the Listing of Impairments, 20 C.F.R.

21                  Part 404, Subpart P, Appendix 1 ("Listings").

22          2.      Plaintiff's allegations regarding her limitations are not totally credible.

23          3.      Plaintiff has the residual functional capacity to lift/carry 20 pounds occasionally and 10

24                  pounds frequently, to stand and/or walk for six hours, and to sit six hours in an eight-

25                  hour workday.  Plaintiff is restricted to perform overhead work with her right upper

26                  extremity.  (AR 38.)

27          4.      Plaintiff's past relevant work as administrative assistant and budget operations analyst

28                  did not require performance of work-related activities precluded by plaintiff's residual

23

1 functional capacity.

2     5.    Plaintiff's medically determinable degenerative disc disease of the cervical spine and

3         hypertension do not prevent plaintiff to perform plaintiff's past relevant work, as

4         supported by vocational expert testimony.  There are a significant number of skilled, light

5         and sedentary jobs available in California, including 447,000 secretary positions

6         available (2/3 at sedentary level), 78,000 computer work positions available at light level,

7         and transcription (lumped with secretary) which comprises a quarter of the sedentary

8         numbers and which are a significant number of jobs.  (AR 38-39.)

9 **DISCUSSION**

10 **Standard Of Review**

11     Congress has provided limited judicial review of a Commissioner's decision made through an

12 ALJ.  *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if

13 supported by substantial evidence, shall be conclusive . . .).  A court must uphold the Commissioner's

14 decision, made through an ALJ, when the determination is not based on legal error and is supported by

15 substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of*

16 *Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant

17 could perform light work contrary to treating physician's findings).[1]  Substantial evidence is "more than

18 a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a

19 preponderance, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial

20 evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion."

21 *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

22     The record as a whole must be considered, weighing both the evidence that supports and detracts

23 from the Commissioner's conclusion.  *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is

24 substantial evidence to support the administrative finding, or if there is conflicting evidence that will

25 support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.

26 _____

27     [1]    "The district court properly affirms the Commissioner's decision denying benefits if it is supported by

28 substantial evidence and based on the application of correct legal standards."  *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

*Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).

This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Plaintiff bears the burden to prove that he is disabled which requires presentation of "complete and detailed objective medical reports of his condition from licensed medical professionals."  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).  "Failure to prove disability justifies a denial of benefits."  *Ukolov v. Barnhart*, 420 F.3d 1002, 1004 (9th Cir. 2005); *see Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir.1995), *cert. denied*, 517 U.S. 1122, 116 S.Ct. 1356 (1996).  Plaintiff must furnish medical and other evidence about plaintiff's medical impairments. 20 C.F.R. §§ 404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine whether you are disabled or blind.  You are responsible for providing that evidence.")

        Plaintiff claims disability since November 9, 2000 due to myofascial pain, bulging cervical disc, mild carpal tunnel syndrome, pain in right wrist, arms and shoulders, and headache.  (AR 23,108, 112, 129.)[2]

With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's January 20, 2005 decision.

### Plaintiff's Credibility

Plaintiff takes exception with the ALJ's evaluation of plaintiff's claims regarding her neck, fibromyalgia and mental impairments and limitations.  The Commissioner responds that the ALJ

---

[2]        During the progress of her claim, plaintiff appears to add depression as an impairment.

"properly evaluated the credibility of [plaintiff's] subjective complaints" and "made specific, clear and convincing findings supported by substantial evidence in the record, explaining his credibility determinations."

"Credibility determinations are the province of the ALJ." *Fair*, 885 F.2d at 604; *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988). "An ALJ cannot be required to believe every allegation of disabling pain." *Fair*, 885 F.2d at 603. An ALJ "may disregard unsupported, self-serving statements." *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir. 1995).

A claimant bears an initial burden to "produce objective medical evidence of underlying 'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably be expected to produce pain or other symptoms.'" *Baston v. Commissioner of Social Security*, 359 F.3d 1190, 1196 (9th Cir. 2004) (quoting *Smolen*, 80 F.3d at 1281)). If a claimant satisfies such initial burden and "if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms with 'specific findings stating clear and convincing reasons for doing so.'" *Baston*, 359 F.3d at 1196 (quoting *Smolen*, 80 F.3d at 1284). "If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

If an ALJ's credibility finding is supported by substantial evidence in the record, a reviewing court may not engage in second-guessing. *Thomas*, 278 F.3d at 959. A reviewing court will not reverse an ALJ's credibility determinations "based on contradictory or ambiguous evidence." *Johnson*, 60 F.3d at 1434 (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)). "So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). Moreover, "the ALJ is entitled to draw inferences 'logically flowing from the evidence.'" *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

26

In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c). An ALJ's finding that a claimant generally lacked credibility is permissible basis to reject excess pain testimony.

*See also* SSR 96-7p.[3]

An ALJ may consider the following factors to determine the credibility of a claimant's allegations of disabling pain:

1.    The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2.    Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3.    Type, dosage, effectiveness, and adverse side-effects of pain medication;

4.    Treatment, other than medication, for pain relief;

5.    Functional restrictions;

6.    Claimant's daily activities;

7.    Unexplained, or inadequately explained, failure to seek treatment or to follow up a prescribed course of treatment; and

8.    Ordinary techniques to test a claimant's credibility.

*Bunnell*, 947 F.2d at 346; *see* 20 C.F.R. §§ 404.1529, 416.929.

After exhaustively detailing the medical record (AR 23-31), the ALJ concluded that plaintiff's "allegations and subjective complaints are not totally credible and are only partially supported by the substantial medical evidence." (AR 31.) Turning to plaintiff's claims as to her neck, the ALJ explained:

The claimant alleges a history of lower back and neck pain. However, these complaints do not meet or equal the criteria of sections 1.02 or 1.04, Appendix 1, Subpart P,

---

[3]    SSR 96-7p sets out factors to assess a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, claimant receives or has received for relief of pain or other symptoms; (6) measures other than treatment claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

Regulations No. 4. A cervical MRI performed in March 2001 revealed posterocentral small disc protrusion but without cord compression, and C6-7 mild disc bulge with very mild foraminal stenosis (Exhibit 3F, pp. 11-13). A repeat cervical MRI performed in January 2004 revealed mild disc bulge at C6-7 resulting in moderate to severe right neural foraminal narrowing and mild central canal narrowing (Exhibit 28F, pp. 1-2). Claimant was ruled out for surgical intervention (Exhibit 5F; 21F, p. 8). There is no radiographic evidence of herniated nucleus pulposus, or cord or nerve root compression. There is no evidence of significant limitation of motion of the spine; back flexion was to 70 degrees (Exhibit 10F). Claimant's neck motion was restricted about 30 percent in January 2002 (Exhibit 11F). However, following trigger point injections, medications and physical therapy, Dr. O'Laughlin reported range of motion was just mildly restricted, from fair to good, in the cervical and lumbar regions (Exhibit 19F, p. 4). Neurlogical examinations were essentially normal, with no reports of sensory or reflex loss, or atrophy with associated muscle weakness (Exhibits 5F, 10F, 11F). Dr. Watson felt claimant did not give maximal effort on strength testing, and Dr. Scherman also felt claimant's grip was not a valid finding (Exhibits 5F, 11F). (AR 31-32.)

The ALJ properly noted that plaintiff failed to produce objective medical evidence of an underlying neck impairment which reasonably could be expected to produce pain and limitations to the degree claimed by plaintiff. The ALJ further pointed to plaintiff's good response to trigger point injections. Moreover, Dr. Fujihara observed mild to moderate cervical and upper back muscle spasms. (AR 442-447, 449.) Plaintiff reported relief and reduction in pain and muscle spasms after trigger point and cortisone injections and massage therapy. (AR 416, 421, 431.) Dr. Jakubowski assessed mild C3-4 and C6-7 disc protrusion. (AR 423.) Chiropractor Mr. Bowen noted decrease in plaintiff's neck and shoulder pain and discomfort. (AR 412-414.) Dr. von Kaenel noted plaintiff's 5/5 extremities strength. (AR 257.) Dr. Watson doubted cervical radiculopathy and noted plaintiff's ability to perform "most activities of daily living." (AR 264.) Dr. Watson's neck and upper extremities examination revealed normal overall body motion. (AR 266.) Dr. R. Damania found power was grade 5/5 in plaintiff's upper extremities and noted the absence of "ankylosis, deformities, subluxations or signs of acute or chronic inflammation, spasticity, rigidity, spasms, atrophy or gross weakness." (AR 282, 293.) Dr. Cantrell diagnosed neck strain and consistently recommended progressive/resistive exercises and physical therapy. (AR 331-332, 327, 364, 652, 654.) Dr. O'Laughlin noted "very good relief" of plaintiff's neck pain after suboccipital injections. (AR 667, 691.) Physical therapy and pool exercises improved plaintiff's symptoms. (AR 191, 195, 197, 198, 201, 293, 211, 212, 214, 216, 219-221, 224, 250, 325, 327, 332, 364, 412-414, 418, 430, 431, 436, 438, 444, 445, 652, 654, 667, 690, 691.) Based on the evidence, the ALJ made proper credibility determinations regarding plaintiff's allegations as to her neck.

Plaintiff argues that "the ALJ erred by applying an incorrect standard to evaluate Plaintiff's allegations concerning fibromyalgia." Plaintiff relies on Dr. O'Laughlin's fibromyalgia diagnosis. After thoroughly reviewing Dr. O'Laughlin's treatment (AR 29-30), the ALJ discounted plaintiff's fibromyalgia symptoms:

> Dr. O'Laughlin also diagnosed fibromyalgia syndrome (Exhibit 29F, pp. 5-6). However, fibromyalgia is not a disease which can be objectively tested. The claimant's allegation of fibromyalgia does not equal the criteria of any section of the Listings. There is no objective evidence of inflammatory arthritis or undifferentiated connected tissue disorder. There are no serology tests for rheumatoid factor or antinuclear antibody. . . . The claimant does not have joint inflammation or deformity in two or more major joints (Exhibit B7F, page 13). She does not have ankylosing spondylitis or other spondyloarthropy. She does not have signs of peripheral joint inflammation, and significant, documented constitutional symptoms and signs such as fever, malaise, or significant weight loss, and involvement of two or more body systems at a moderate level of severity. There was no swelling or inflammation of the fingers or wrists, and claimant is not given any manipulative limitations (Exhibit 28F, p. 8). The claimant is able to ambulate effectively. There was good range of motion of the weight-bearing joints without any inflammatory state. It is significant that Dr. O'Laughlin reported multiple trigger points of tenderness, but also reported significant decrease in symptoms following physical therapy and trigger point injections, and claimant reported she has decreased the amount of pain pills she took (Exhibits 29F, p. 1; 31F, p. 1). Claimant's mobility was not reported to be significantly restricted. There were no neurological deficits. There was no muscle atrophy. It can be inferred that, although the claimant may experience some degree of pain, that pain has apparently not altered her use of muscles and joints to the extent that it has resulted in diffuse muscle wasting. (AR 33.)

The ALJ carefully dissected the medical evidence to conclude that plaintiff failed to establish an impairment or combination of impairments to produce pain and other symptoms to the degree claimed by plaintiff. The ALJ provided clear, specific findings to discount plaintiff's claims. "[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ adeptly resolved conflicts in his evaluation of fibromyalgia, and this Court is not in a position to second guess the ALJ. Of key importance, Dr. O'Laughlin consistently recommended conservative treatment, physical therapy and injections which produced favorable results. (AR 661, 662, 671, 685, 686, 690, 691.) *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly considered treating physician's failure to prescribe and claimant's failure to request "any serious medical treatment for this supposedly excruciating pain"); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) ("conservative treatment" suggests "a lower level of both pain and functional limitation"); *Bunnell*, 947 F.2d at 346 ("unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" is

relevant to assess credibility); *see also Flaten v. Secretary of Health & Human Servs.*, 44 F.3d 1453, 1464 (9th Cir. 1995) (ALJ entitled to draw inference from general lack of care). The ALJ properly noted plaintiff's conservative care. (AR 32.) In addition, notations in the record question the degree of plaintiff's claims. Dr. Scherman bluntly noted: "Quite frankly, I believer her expression of disability and her perception of it is certainly greater than it is." (AR 304.) Mr. Bowen commented that plaintiff exhibited symptom magnification. (AR 415.) Plaintiff fails to demonstrate error in the ALJ's evaluation of plaintiff's fibromyalgia claims or the ALJ's reference to plaintiff's conservative treatment.

Plaintiff argues that the ALJ improperly discredited plaintiff's claims regarding her mental impairments. After outlining in detail plaintiff's mental health care (AR 24, 27-29), the ALJ properly discounted plaintiff's alleged mental impairments:

> Although the claimant alleges a history of depression, the supporting medical evidence from both the treating and consulting sources indicates that this was acute for less than 12 months, and that it was controlled with medication. The most recent medical evidence indicates the claimant reports she is not depressed and no longer takes any psychotropic medication (Exhibit 29F, p. 4). The medical evidence of record does not establish that this impairment is severe as defined by the Regulations, as there are no apparent limitations, therefrom, and this was only minimal, if any, effect on her ability to work. (AR 24.)

The ALJ further explained:

> From a mental standpoint, the claimant alleges a history of depression; however, there is no longitudinal history of severe psychiatric illness with marked dysfunction lasting for 12 continuous months. Claimant reported she had symptoms of depression and anxiety secondary to chronic pain and not being able to return to work (Exhibit 10F). Claimant reported that she was frustrated with depending on her husband and family, which made her stressed and brought on depression (Exhibit 6E, p. 4). Claimant underwent pain management counseling by a licensed social worker, who opined claimant had major depression, and that her concentration and memory were impaired. However, Mr. Green later reported that claimant's depressive symptoms had decreased with prescribed medication from Dr. Atwal. Mr. Green reported claimant's depression was stable and under good control with medication (Exhibit 24F, p. 4). Dr. Atwal also diagnosed major depression, but assessed her GAF at 70, indicating only mild symptoms (Exhibit 8F, p. 3). Claimant reported she had increased her activity level, and had enjoyed taking a vacation (Exhibit 19F, p. 14). Dr. Atwal concluded in October 2001 that claimant was capable of performing simple as well as complex job instructions, and could relate with her supervisors and coworkers (Exhibit 8F, p. 2). . . .
>
>     . . .
>
> Also showing claimant's allegations are not fully supported per Social Security Ruling 96-7p, it does not appear that the claimant is as dysfunctional as alleged. Although claimant reported she was isolative, her own written report indicated she left her home during the week on errands, and she visited with her family on a weekly basis (Exhibit 6E). Claimant's friend, Ms. Canada, reported claimant spent her day in pain, yet she also

1    noted that claimant performed a wide range of daily activities, including taking walks,
2    doing light household chores, cooking, and doing laundry (Exhibit 5E). Claimant spoke
     each day with her friend, Ms. Canada. She is able to go to the gym and exercise regularly
3    (Exhibit 29F, p. 4). She is able to drive herself to shop, to doctor appointments, and to
     visit family. She has taken vacations. Although these physical activities are not
4    extensive, they are certainly age appropriate. I particularly note that the claimant has not
     worked since November 2000, and receives a pension from Fresno State University; in
5    other words, she presently has a retired lifestyle and may not be motivated to return to
     work. (AR 34-35.)

6    The ALJ properly concluded that the "overall evidence indicates that claimant's depression was stable

7    and controlled with medication by September 2002" and that plaintiff "did not appear to be in significant

8    distress at the hearing, and was able to testify in a responsive manner without any noticeable problems

9    with memory or thought content." (AR 34, 35.) The ALJ thoroughly reviewed factors to evaluate

10   plaintiff's credibility regarding her mental health allegations.

11        In addition to the evidence discussed by the ALJ, Dr. Atwal consistently noted plaintiff's good

12   insight and judgment, intact cognitive functions, and absence of medication side effects. (AR 273-276,

13   278, 381-395.) Dr. Atwal noted improvement with medication management. (AR 272, 273, 381-384,

14   386, 388, 390, 394.) In February 2002, Dr. Atwal assessed that plaintiff's depression appeared in

15   "remission." (AR 390.) Mr. Green noted plaintiff's consistent improvement and in February 2002,

16   found plaintiff "basically stable" with her depression "under good control" with medication. (AR 487,

17   489, 490, 493.) Dr. S. Damania commented on plaintiff's grossly intact memory, average intelligence

18   and fair insight and judgment. (AR 286.) Plaintiff reported to Dr. Whyman that she reads for an hour

19   or two daily, is in a book club and reads two or three books monthly. (AR 349.) Plaintiff further

20   reported to Dr. Whyman that she "felt good" during a fall 2001 cruise and had a relaxing weekend in

21   Monterey a few months prior to the examination. (AR 350.) Plaintiff informed Dr. Whyman that she

22   hoped to perform volunteer work. (AR 350.) Dr. Whyman's mental status examination revealed

23   absence of thought disorder and cognitive interruption. (AR 352, 353.) Dr. Whyman recommended

24   weaning plaintiff off her antidepressant medications and concluded that plaintiff "is not precluded from

25   work in a wide variety of other settings." (AR 361.) Dr. Zampardi's testing revealed absence of

26   disabling anxiety. (AR 370, 371.) Dr. Garcia and Dr. Ginsburg found an absence of severe mental

27   impairments. (AR 305.)

28        Moreover, in a questionnaire, plaintiff's friend noted that plaintiff is able to manage bills,

1   maintain banking accounts, go out and drive, read and remember what she read, watch television two

2   or three hours daily and movies, get along with others, visit friends and relatives, care for her dogs and

3   follow instructions.  (AR 158-160.)  Plaintiff's questionnaire responses echoed those of her friend, and

4   plaintiff noted that she is able to read, remember what she reads, watch television three hours daily and

5   movies, drive a car, get along with others and talk to relatives.  (AR 162, 164, 165.)  Plaintiff testified

6   that Mr. Green's treatment helped her "tremendously."  (AR 744.)  Initially during her testimony,

7   plaintiff denied medication side effects but later noted concentration and memory difficulties despite

8   medical notations to the contrary.  (AR 744.)  Plaintiff testified to her frequent gym and occasional

9   church attendance.  (AR 746, 747.)  As noted above, the evidence supports that the ALJ committed no

10  error in evaluation of plaintiff's mental health claims.

11          Plaintiff contends that the ALJ improperly referenced plaintiff's gym attendance, daily activities

12  and retirement status to discredit plaintiff's claims.  Plaintiff fails to demonstrate ALJ error to factor

13  daily activities in that an ALJ may consider performance of daily activities.  *See Fair*, 885 F.2d at 603.

14  The ALJ's passing comment as to plaintiff's retirement status is no more than a reasonable inference

15  from the evidence.  *See Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (an ALJ is entitled to

16  draw inferences logically flowing from the evidence).

17                    **Dr. Jakubowski and Dr. O'Laughlin's Assessments**

18          Plaintiff criticizes the ALJ's evaluation of treating physicians Dr. Jakubowski and Dr.

19  O'Laughlin's opinions.  The Commissioner responds that the ALJ properly evaluated their opinions.

20          A treating physician's opinion is not conclusive as to a claimant's condition or the ultimate issue

21  of disability and may be disregarded by the ALJ even when it is not contradicted.  *See Matney v.*

22  *Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Rodriguez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th Cir.

23  1989); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).[4]  An ALJ may reject a treating

24  physician's opinion whether or not it is contradicted, if the opinion is "brief and conclusory in form with

25  little in the way of clinical findings to support its conclusion."  *Magallanes,* 881 F.2d at 751.

26  _____

27          [4]      A treating physician's opinion is not conclusive as to claimant's disability as this ultimate issue is an
    administrative finding reserved to the Commissioner.  20 C.F.R. § 404.1527(e).  The Commissioner has final responsibility
28  to determine a claimant's residual functional capacity.  20 C.F.R. § 404.1546.

1  Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute

2  specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

3         The Ninth Circuit Court of Appeals has further explained:

4              To reject the opinion of a treating physician which conflicts with that of an
       examining physician, the ALJ must "'make findings setting forth specific, legitimate

5      reasons for doing so that are based on substantial evidence in the record.'" . . . "The ALJ
       can meet this burden by setting out a detailed and thorough summary of the facts and

6      conflicting clinical evidence, stating his interpretation thereof, and making findings.". 
       . . The rule . . . does not apply, however, "when the nontreating physician relies on

7      independent clinical findings that differ from the findings of the treating physician." . .
       . "'[T]o the extent that [the nontreating physician's] opinion rests on objective clinical

8      tests, it must be viewed as substantial evidence . . .'"

9  *Magallanes*, 881 F.2d at 751(citations omitted.)

10        An ALJ may reject a treating physician's report based on a claimant's exaggerated claims. *See,*

11 *e.g., Sandgathe*, 108 F.3d at 980.  A physician's opinion of disability "premised to a large extent upon

12 claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints

13 have been "properly discounted." *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citing *Brawner v.*

14 *Sec. of Health & Human Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d

15 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997) ("no physician has been able

16 to find a link between [claimant's] complaints and known medical pathologies").

17        "The opinions of non-treating or non-examining physicians may also serve as substantial

18 evidence when the opinions are consistent with independent clinical finding or other evidence in the

19 record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

20        "[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical

21 testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

22 Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute

23 specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

24        As a reminder, Dr. Jakubowski found no less than 70 percent loss of work capacity secondary

25 / / /

26 / / /

27 / / /

28 / / /

33

to work-related injury in connection with plaintiff's workers' compensation claim.[5]  (AR 416.)  Dr.

O'Laughlin completed a November 3, 2004 questionnaire to indicate that plaintiff is precluded from full-

time work at any exertional level based on her capacity for repetitive usage of upper extremities.  (AR

693.)  Dr. O'Laughlin estimated that during an eight-hour day, plaintiff is able to sit 30 minutes and to

stand/walk 20 minutes.  (AR 693.)  Dr. O'Laughlin noted that during an eight-hour day, plaintiff needs

to lie down or elevate her legs three times for one hour or for half an hour twice daily.  (AR 693.)  Dr.

O'Laughlin noted that plaintiff has limitations due to hand impairments from myofascial pain syndrome

and is able to lift up to three pounds frequently.  (AR 694.)  During an eight-hour day, Dr. O'Laughlin

estimated that plaintiff is able reach and handle 30 minutes, lift 10-15 pounds up to five minutes two or

three times, and grasp two to three minutes at a time for 20 minutes.  (AR 694.)  Dr. O'Laughlin

estimated that plaintiff is able to reach, handle, push/pull and grasp continuously for three to five

minutes.  (AR 694.)

The ALJ discounted Dr. Jakubowski's assessment:

> Limited weight is given to the treating physician's statement in August 2001 that the claimant has lost 70% of her work capacity, since this is unsupported by objective findings of limitations in range of motion, motor strength, and flexibility of claimant's upper extremities, as noted by Dr. Watson (Exhibits 5F, 21F.)  This report does not indicate what the claimant could still do despite her impairments.  (AR 36.)

Likewise, the ALJ discounted Dr. O'Laughlin's questionnaire responses:

> Little weight is given to this questionnaire; as Dr. O'Laughlin noted, there are no known markers or laboratory abnormalities to support this conclusion.  There is no objective evidence of arthritis or carpal tunnel syndrome that is more than mild.  Furthermore, the medical evidence notes that claimant reported improvement with physical therapy and trigger point injections.  It was reported there was "significant decrease" in muscle tenderness (Exhibit 31F, p. 12).  (AR 36.)

The ALJ properly found that Dr. Jakubowski's overly restrictive limitations lacked objective

support.  As was his province, the ALJ credited (over Dr. Jakubowski's assessment) portions of the

---

[5]     The "categories of work under the Social Security disability scheme are measured quite differently" than under the California workers' compensation scheme in that they "are differentiated primarily by step increases in lifting capacities."  *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988).  "California Guidelines for Work Capacity are not conclusive in a social security case."  *Marci v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996).  "Workers' compensation disability ratings are not controlling in disability cases decided under the Social Security Act, and the terms of art used in the California workers' compensation guidelines are not equivalent to Social Security disability terminology."  *Booth v. Barnhart*, 181 F.Supp.2d 1099, 1104 (C.D. Cal. 2002).

1   opinions of Dr. Scherman, Dr. Watson and Dr. Wong which serve as substantial evidence based on their

2   independent clinical findings.  *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  The ALJ

3   discharged his responsibility to resolve the conflicting assessments as to plaintiff's limitations.  *See*

4   *Andrews*, 53 F.3d at 1041.  "Where evidence is susceptible of more than one rational interpretation, it

5   is the ALJ's conclusion which must be upheld."  *Sample*, 694 F.2d at 642 (citing *Rhinehart v. Finch*, 438

6   F.2d 920, 921 (9th Cir. 1971)).  "The ALJ need not substitute the judgment of expert witnesses for his

7   own."  *Sample*, 694 F.2d 642.  As noted by the Commissioner, to the extent they are consistent with

8   opinions of consultative physicians Dr. R. Damania, Dr. Scherman and Dr. Watson, Dr. Wong's residual

9   functional capacity findings are substantial evidence on which to rest the ALJ's findings.  *See Andrews*,

10  53 F.3d at 1041 (reports of a non-examining physician "serve as substantial evidence when they are

11  supported by other evidence in the record and are consistent with it").

12         The ALJ was entitled to reject Dr. O'Laughlin's questionnaire assessment in that it is "brief and

13  conclusory in form with little in the way of clinical findings to support its conclusion."  *Magallanes*, 881

14  F.2d at 751.  Dr. O'Laughlin's cryptic form responses are not entitled to deference.  *Crane v. Shalala*,

15  76 F.3d 251, 253 (9th Cir. 1996); *Murray v. Heckler*, 722 F.2d 499, 501 (9th Cir. 1983) (expressing

16  preference for individualized medical opinions over check off forms); *see Batson v. Commissioner*, 359

17  F. 3d 1190, 1195 (9th Cir. 2003) (ALJ properly discounted a physician's checklist form which lacked

18  supportive evidence, was contradicted by other statements and assessments of claimant's condition, and

19  was based on claimant's subjective descriptions).  Plaintiff demonstrates no error in the ALJ's evaluation

20  of Dr. Jakubowski and Dr. O'Laughlin's assessments.

21                                    **Dr. Wong's Assessment**

22         Plaintiff contends that the ALJ "substituted his own opinion for MC Wong's opinion" and

23  concluded that "mild median nerve involvement in the right upper extremity would not give rise to a

24  manipulative limitation."  The Commissioner responds that there was a lack of objective clinical

25  evidence to support Dr. Wong's opinion that plaintiff needed to alternate between sitting and standing

26  and that plaintiff was limited to reach in all directions and to handle with her right upper extremity.

27         As a reminder, Dr. Wong assessed that plaintiff is able to: (1) lift/carry 20 pounds occasionally

28  and 10 pounds frequently; (2) stand/walk about six hours in an eight-hour workday; and (3) sit about six

hours in an eight-hour workday but must periodically alternate sitting and standing to relieve pain and discomfort.  (AR 309.)  Dr. Wong noted the absence of postural limitations but limited overhead work and forceful and repetitive grasping and twisting.  (AR 311.)  Dr. Wong assessed a light residual functional capacity with a sit/stand alternative as needed to relieve discomfort.  (AR 314.)  The ALJ agreed with a light residual functional capacity but disagreed that plaintiff is limited in overhead work with her right upper extremity.  (AR 36.)  The ALJ disregarded the sit/stand option "as there is no evidence that the claimant has an impairment of the lumbar spine or lower extremities such as disc herniation, cord impingement, joint ankylosis or knee or hip problems."  (AR 36.)  The ALJ rejected handling or gross manipulation limitations in the right upper extremity in that "[r]epeat EMG/nerve conduction velocity studies concluded that there was no more than *mild* median nerve involvement in the right upper extremity."  (AR 36; italics in original.)

An ALJ need not agree "with everything an expert witness says . . . to hold that his testimony contains 'substantial evidence.'"  *Russell*, 856 F.2d at 83.  The ALJ discussed Dr. Wong's assessment and accorded it the weight deemed proper.  The ALJ properly explained portions he accepted and those which he did not.  The ALJ properly noted the absence of an impairment of the lumbar spine or lower extremities and that repeat EMG and nerve conduction studies showed no more than mild median nerve involvement of plaintiff's right upper extremity.  Dr. Fujihara noted plaintiff's mild to moderate cervical and upper back muscle spasms and full range of motion in her shoulders, elbows, wrists and fingers.  (AR 442-447, 449.)  Dr. Jakubowski noted grossly intact strength in plaintiff's right upper extremity and slightly limited right shoulder range of motion.  (AR 438.)  A March 14, 2001 electrodiagnostic evaluation revealed evidence of mild median nerve neuropathy in plaintiff's right wrist and no evidence of cervical radiculopathy.  (AR 424.)  Dr. Watson questioned cervical radiculopathy, mild carpal tunnel syndrome, chronic trapezial strain, and shoulder derangement problems.  (AR 264.)  Dr. Watson's neck and upper extremity examination revealed normal overall body motion.  (AR 266.)  Dr. R. Damania found power was grade 5/5 in plaintiff's upper extremities and noted that none of plaintiff's joints "had any evidence of ankylosis, deformities, subluxations or acute or chronic inflammation."  (AR 282.)  Dr. R. Damania found plaintiff "fully ambulatory" and noted the absence of manipulative impairments.  (AR 293.)  Dr. Scherman found plaintiff had "full and free range of

1  motion of the shoulders, elbows, wrists, hands and fingers." (AR 301.) Dr. Scherman concluded that

2  plaintiff may never have had carpal tunnel syndrome or that it resolved and that plaintiff "does not

3  currently have carpal tunnel syndrome." (AR 303.) Plaintiff fails to demonstrate error in the ALJ's

4  evaluation of Dr. Wong's assessment.

5  **Dr. Scherman's Assessment**

6  Plaintiff objects that the ALJ failed to include Dr. Scherman's neck limitation in the ALJ's

7  residual functional capacity finding. Plaintiff further assigns error to the ALJ's failure to include Dr.

8  Scherman's right arm limitation of no heavy use in a hypothetical to Ms. Chandler and in the ALJ's

9  residual functional capacity finding. The Commissioner disagrees that the ALJ committed error

10  regarding his residual functional capacity finding.

11  As a reminder, the ALJ gave "great weight to Dr. Scherman's determination that claimant was

12  precluded from no heavy use of the right arm and from over-shoulder height work with either arm." (AR

13  36.) The ALJ disagreed "with any left upper extremity limitations; there is no evidence of any left upper

14  extremity joint deformities, rotator cuff injury, arthritis, or nerve entrapment." (AR 36.)

15  As noted above, an ALJ need not agree with a physician's assessment in total to find a portion

16  of it constitutes substantial evidence. *See Russell*, 856 F.2d at 83. As such, plaintiff points to no error

17  in the ALJ's failure to include Dr. Scherman's neck limitation in the ALJ's residual functional capacity

18  finding. As to the preclusion of right arm heavy use, the Commissioner correctly notes that the ALJ's

19  hypothetical limited lifting to 20 pounds occasionally and 10 pounds frequently and preclusion of right

20  upper extremity overhead work. (AR 755.) Again, plaintiff fails to establish ALJ error as to preclusion

21  of right arm heavy use. The ALJ properly resolved conflicts in the medical evidence, including those

22  arising from Dr. Scherman's assessment.

23  **Fibromyalgia And Fatigue**

24  Plaintiff asserts that the ALJ erroneously failed to consider fibromyalgia effects, including fatigue

25  and sleep disturbance. The Commissioner responds that such assertion lacks merit.

26  The ALJ reviewed in detail Dr. O'Laughlin's fibromyalgia diagnosis and related treatment. (AR

27  29.) As discussed in detail above, the ALJ found that plaintiff's "allegation of fibromyalgia does not

28  equal the criteria of any section of the Listings" in light of limited objective clinical evidence to support

1   a fibromyalgia diagnosis.  (AR 33.)  Physical and pool therapy and injections decreased plaintiff's

2   symptoms and medication use.  (AR 191, 195, 197, 198, 201, 293, 211, 212, 214, 216, 219-221, 224,

3   250, 325, 327, 332, 364, 412-414, 418, 430, 431, 436, 438, 444, 445, 652, 654, 667, 690, 691.)  The ALJ

4   properly pointed out that plaintiff reported to Dr. Atwal improved sleep, energy and activity.  (AR 27,

5   28, 381-384, 388, 390, 391, 393, 394.)  The ALJ based his residual functional capacity finding on the

6   medical evidence and evaluation of plaintiff's claims, and plaintiff points to no meaningful error in such

7   finding.

8                              **CONCLUSION AND ORDER**

9            For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

10  properly concluded that plaintiff is not disabled up to January 21, 2005.[6]  This Court further finds the

11  ALJ's decision is supported by substantial evidence in the record as a whole and based on proper legal

12  standards. Accordingly, this Court DENIES plaintiff's requests to reverse the Commissioner's decision,

13  to award plaintiff disability insurance benefits or to remand for further proceedings.  This Court

14  DIRECTS the Court's clerk to enter judgment in favor of defendant Jo Anne B. Barnhart, Commissioner

15  of Social Security, and against plaintiff Sharon Meyers and to close this action.

16           IT IS SO ORDERED.

17  **Dated:    December 28, 2006**              **/s/ Lawrence J. O'Neill**
    66h44d                                  UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27  ─────────────────

28      [6]      In her reply papers, plaintiff notes that SSA awarded plaintiff benefits on her application filed after the
    ALJ's January 21, 2005 decision.  This Court's review is limited up to January 21, 2005.

38